**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE TENET HEALTHCARE CORPORATION SECURITIES LITIGATION. | § | CIVIL ACTION NO. 3:16-CV-2848-SRC |
| | § | CONSOLIDATED AMENDED COMPLAINT-CLASS ACTION |
| | § | DEMAND FOR JURY TRIAL |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs David Burns, Steven Krems, Allan Ramirez and Sameh Yamany ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Amended Complaint against Tenet Healthcare Corporation ("Tenet" or the "Company"), Trevor Fetter ("Fetter"), Daniel J. Cancelmi ("Cancelmi") and Biggs C. Porter ("Porter") (Fetter, Cancelmi and Porter are referred to as the "Individual Defendants"), allege the following based upon personal knowledge as to Lead Plaintiffs and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the independent investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, Tenet, conference calls and announcements made by Defendants, economic analysis of Tenet's stock price movement and pricing volume data, analysts' reports and advisories about the Company, the Non-Prosecution Agreement dated September 30, 2016 (the "Non-Prosecution

Agreement" or "NPA") (annexed hereto as Exhibit A and incorporated by reference herein), and information readily obtainable on the internet. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons or entities who purchased or otherwise acquired Tenet common stock between February 28, 2012 and August 1, 2016, both dates inclusive (the "Class Period"), seeking to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").[1]

2. During the Class Period, Tenet, one of the largest for-profit hospital chains in the United States, violated the securities laws by perpetrating a decade-long kickback scheme extending into 2013, as the Company has now admitted,[2] unbeknownst to investors. Tenet paid kickbacks to Hispanic Medical Management, Inc. d/b/a Clinica de la Mama ("Clinica") in exchange for thousands of illicit referrals for over a decade to fraudulently recover nearly $150 million from the Medicare and Medicaid health programs. In so doing, Tenet systematically violated its internal policies on compliance. These violations were egregious given that Tenet

[1] Excluded from the Class are: Defendants, all current and former officers, directors and senior executives of Tenet, members of the immediate family of any excluded person, any entity in which any excluded person has more than a 5% ownership interest, or which any excluded person controls, and the legal representatives, heirs, successors, or assigns of any such excluded person.

[2] Tenet Healthsystem Medical, Inc. ("Tenet HealthSystem"), a subsidiary of Tenet that directly owns Tenet's hospitals in the Southeastern United States, pursuant to authority granted by Tenet, entered into an NPA in the case of *United States of America v. Atlanta Medical Center, Inc. and North Fulton Medical Center, Inc.*, Case No. 16-cr-350, Dkt. No. 16-3, attached hereto and incorporated herein. Pursuant to the NPA, Tenet Healthsystem admitted that it conspired to violate the Anti-Kickback statute, and that it is responsible for the acts of its officers, directors, employees and agents. Dkt. 16-3. Tenet and Tenet HealthSystem also agreed that the statement of facts, as set forth in Exhibit A of Dkt. No. 16-3, are true and accurate.

had previously engaged in a kickback scheme, for which the Company had reached a billion dollar settlement with the United States government in 2006. Defendants' scheme put Tenet's ability to recover reimbursements for Medicare and Medicaid, a huge source of revenue for the Company, at risk. Moreover, the Company concealed the existence of the extensive government investigation for, at least, nine months from its own investors.

3. After paying nearly $1 billion in 2006 to the government to resolve liability arising under the False Claims Act ("FCA"), Defendants continued to violate federal and state Medicare and Medicaid laws, and the federal Anti-Kickback statute, but failed to disclose these violations to investors. Between February 28, 2012 and February 2014, Tenet, through its most senior officers, including Defendants Fetter, Porter and Cancelmi, made materially false and misleading statements regarding the current state of Tenet's compliance program and internal controls regarding arrangements with referral sources, and failed to disclose the existence of investigations into the Company's practices triggered by subpoenas from Federal agencies. Tenet told investors that its compliance program was designed to meet or exceed the standards of federal and state laws, and that Tenet "systematically" reviewed a "substantial" number of arrangements and transactions with referral sources to determine whether they were in compliance with internal policies and procedures and the federal Anti-Kickback statute. Tenet, in fact, touted that its compliance program was so effective that the Company's unwillingness to engage with risky referral sources put it at a competitive disadvantage. All of these statements were a facade because Tenet was in fact doing the opposite—systemically violating the federal Anti-Kickback statute by obtaining thousands of illegal referrals.

4. By its own admission, Tenet participated in this lucrative kickback scheme for over a decade. During that time, according to the NPA, the Company submitted thousands of false and fraudulent claims to the Medicare and Medicaid health programs, and reaped close to

$150 million from the government in violation of the federal Anti-Kickback statute and the FCA. In addition, as early as December 2009, Tenet was on notice of the scale of this vast conspiracy to violate the Anti-Kickback statute and the FCA because a whistleblower filed a sealed *qui tam* complaint against the Company for knowingly entering into sham contracts with Clinica in exchange for patient referrals.[3]

5. Tenet knew that a knowing violation of the Anti-Kickback statute or the FCA, especially after paying nearly $1 billion in 2006 to the government to resolve liability arising under the FCA, could subject the Company to serious civil and criminal liability, putting it at risk of losing all access to reimbursement from or payment by the Medicare and Medicaid health programs. This was a material source of revenue for Tenet, as it accounted for approximately 30% of the Company's annual revenue.

6. In May 2012, the Office of the Inspector General for the United States Department of Health and Human Services ("OIG-HHS") issued a comprehensive subpoena demanding that Tenet produce documents from January 2004 through May 2012 regarding the relationship between Clinica and Tenet's hospitals in the Southeast Region. Tenet knowingly withheld the existence of this subpoena from investors until February 26, 2013 (roughly nine months) even though it was reasonably possible that the Company faced severe civil and criminal liability that would materially impact its business and operations. Moreover, once Tenet disclosed the existence of the subpoena, Tenet failed to disclose the magnitude of the investigations from federal agencies.

7. Throughout the Class Period, Tenet misled investors to believe that its books and records accurately reflected the Company's financial condition and results. Defendants violated

---

[3] On July 31, 2013, the United States District Court for the Middle District of Georgia granted the State of Georgia's motion to lift the seal. Until then, the details of the *qui tam* action remained hidden from investors and the public at large.

Generally Accepted Accounting Principles ("GAAP") by failing to, at least, disclose an estimate of the amount of possible loss or range of loss in Tenet's financial statements, and deprived investors of the material fact that should the loss occur, Tenet would, at a minimum, pay hundreds of millions of dollars as a direct result of violating the Anti-Kickback Statute and the FCA. Once the government issued a subpoena to Tenet related to the illegal kickback scheme, Tenet recklessly violated GAAP because it failed to disclose that there was a at least a reasonable possibility that the Company would have to pay between, at least, $72 million (the profits it received from the kickback scheme) and, at least, $438 million (three times the revenue received from the illegal scheme).

8. Based on the Defendants' participation in this decade-long kickback scheme, Tenet's financial statements and public disclosures concerning the Company's operations, the adequacy of its internal controls over financial reporting, and compliance-related controls were materially false and misleading throughout the Class Period and its stock price remained artificially inflated.

9. Specifically, the Defendants recklessly failed to disclose that:

(a) Tenet's revenues were derived, in part, from an ongoing kickback scheme that violated the FCA and the Anti-Kickback statute;

(b) Tenet and the Individual Defendants knowingly withheld the existence of a subpoena from the OIG-HHS related to the decade-long kickback scheme and violations of law, a fact likely to have a material impact on the Company's business and financial condition;

(c) Between February 28, 2012 and February 2014, Tenet materially misled

investors to believe that the Company actively (a) monitored and measured adherence to its policies and legal and regulatory requirements related to Medicare and Medicaid, (b) screened individuals for exclusion from Medicare and Medicaid if they did not comply with law, (c) maintained a database of all arrangements with referral sources to monitor disbursement of funds, and (d) oversaw annual audits of referral source arrangements.

(d) Tenet's representations regarding compliance between February 28, 2012 and February 2014 were materially false and misleading when made because the Company was already in violation of the CIA even before it came into existence, and the Tenet hospitals engaged in a widespread scheme to pay kickbacks to Clinica, at least, until September 2013, at the direction and supervision of senior managers.

(e) Between February 28, 2012 and August 1, 2016, Tenet's financial statements repeatedly violated GAAP because, immediately following the issuance of the subpoena, the Company failed to disclose that a loss due to a settlement or penalties was reasonably possible, its nature, and the amount or full range of such loss ($72 million to $438 million), the minimum amount of the profits or revenue earned and on the higher end, treble the amount of revenue earned from illicit transactions entered into by means of the FCA and Anti-Kickback statute violations in violation of ASC 450.

(f) Tenet did not maintain, implement, or enforce adequate internal controls over financial reporting to ensure the accuracy of the Company's books and records, including the fact that certain transactions were funneled to pay kickbacks in exchange for referrals over more than a decade, a repeat violation, and Tenet's financial statements thus failed to comply with GAAP.

10. On February 24, 2014, Tenet partially disclosed the issues related to the kickback scheme and the government investigation, causing the Company's stock to decline by 9%. However, in violation of GAAP, Defendants, failed to disclose that it was reasonably possible that the lower end of the range of settlement or penalties was $72 million, and the upper end of the range of loss was well over $400 million, given that the kickback scheme was Tenet's second serious offense committed in violation of the FCA, and one that was committed while it was still under an agreement with the government stemming from its initial violation of the FCA in 2006.

11. Then, on August 1, 2016, the market learned the full extent of the penalties incurred as a result of its illicit kickback scheme, when Tenet announced in a quarterly report in a Form 10-Q that it had reached an agreement in principle with the Fraud Section of the DOJ and the State of Georgia to pay $513,788,345 to resolve its civil and criminal liability for the decade-long kickback scheme. $368,000,000 of this amount comprised of a civil monetary payment, and $145,788,345 comprised of a criminal monetary payment. On this news, Tenet's share price fell $1.34, or 4.64%, to close at $27.57 per share on August 2, 2016.

12. On October 3, 2016, Defendants issued a press release and filed a Current Report on Form 8-K, in which they disclosed that Tenet HealthSystem entered into an NPA[4] with the Fraud Section of the DOJ, in which Tenet HealthSystem and Tenet agreed to pay $368,000,000 to the United States, the State of Georgia and the State of South Carolina to resolve their liability under the FCA and the Georgia Medicaid False Claims Act. The NPA stated that two of Tenet's

[4] In the NPA, Tenet HealthSystem and Tenet expressly agreed not to contradict the facts described in the Statement of Facts attached to the NPA in any subsequent litigation. The vast majority of facts recited in the CAC at ¶¶ 2-90 are taken directly from the Statement of Facts attached to the NPA.

major hospitals in the Southeastern United States agreed to pay $144,715,745 to resolve the hospitals' criminal liability for knowingly violating the federal Anti-Kickback statute.

13. Defendants also announced that two of Tenet's hospitals had agreed to plead guilty, in the Northern District of Georgia, to a conspiracy to defraud the United States and pay and receive healthcare related kickbacks.

14. On January 25, 2017, John Holland ("Holland"), a senior executive of Tenet HealthSystem, was indicted in the Southern District of Florida on one count of mail fraud, one count of healthcare fraud, and two counts of major fraud against the United States. According to Holland's attorney, the illegal contracts "were openly reviewed and approved at multiple levels of the company[.]"[5] Holland was Senior Vice President of Hospital Operations, one of the most senior executive officers at Tenet, responsible for overseeing operations of all hospitals in the Southern States region.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's securities, upon the disclosures thereof, Plaintiffs and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

---

[5] http://healthcare.dmagazine.com/2017/02/07/former-tenet-healthcare-corp-executive-indicted-for-alleged-part-in-400-million-scheme/

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) given that a significant portion of the Defendants' actions, and the subsequent damages, took place within this District. Tenet is a corporation incorporated in Nevada with its principal place of business in Dallas, Texas, and the Defendants reside in or around Dallas, Texas.

19. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

20. Lead Plaintiffs purchased Tenet securities at artificially inflated prices during the Class Period, and suffered damages as a result of the disclosure of federal securities laws violations alleged herein.

21. Defendant Tenet is a Nevada corporation with its principal executive offices located at 1455 Ross Avenue, Suite 1400, Dallas, Texas 75202. Tenet's shares trade on the NASDAQ national market under the ticker symbol "THC." Tenet, together with its subsidiaries, primarily operates acute care hospitals and related healthcare facilities. The Company's core operations are broken down into three segments: Hospital Operations, Ambulatory Care and Conifer Health Solutions, which provides managed services to health systems and their health plans. Currently, the Company operates 80 hospitals, 20 short-stay surgical hospitals, and approximately 470 outpatient centers in the United States. Tenet's subsidiary, Tenet HealthSystem, owns for-profit hospitals in Tenet's Southern States Region. Between 2000 and April 2016, Tenet HealthSystem owned Atlanta Medical Center, Inc. ("AMC"), North Fulton

Hospital Inc. ("North Fulton"), Spalding Regional Medical Center ("Spalding Regional") and Hilton Head Health System, LP ("Hilton Head").

22. Defendant Fetter has served as Tenet's Chief Executive Officer ("CEO") since September 2003. In May 2015, he was appointed as the Chairman of Tenet's Board of Directors. Between October 1995 and February 2000, Fetter served in various senior management positons at Tenet, including Chief Financial Officer ("CFO").

23. Defendant Cancelmi has served as Tenet's CFO since September 10, 2012. Between 2004 and 2007, Cancelmi served as Tenet's controller. In 2007, he was appointed as Tenet's principal accounting officer, and promoted to Senior Vice President in April 2009.

24. Defendant Porter served as Tenet's CFO from June 2006 until his resignation on March 30, 2012. Porter currently serves as the Executive Vice President and CFO of Fluor Corporation in Irving, Texas.

## BACKGROUND

**The Medicare and Medicaid Programs**

25. In 1965, Congress enacted the Medicare program to pay for certain healthcare costs. Individual beneficiaries are entitled to enroll in Medicare based on age, disability, or end-stage renal disease. The Department of Health and Human Services ("HHS") administers and supervises the Medicare program. The Centers for Medicare and Medicaid ("CMS") is an agency of HHS with direct responsibility over the Medicare and Medicaid programs.

26. Part A of the Medicare program allows for the payment of hospital care, nursing facilities and home healthcare. Part A also allows private hospitals to seek federal funds from the Medicare Disproportionate Share (DSH) program if they treat a significant number of low-income patients. Medicare program participants, including Tenet and its subsidiaries, are required to enter into enrollment agreements, in which they certify an understanding that the

payment of claims is conditioned upon compliance with the Anti-Kickback statute. Participants are also required to submit hospital cost reports on an annual basis, and the participants are paid by CMS after the inpatient or outpatient services are rendered.

27. In 1965, Congress also created the Medicaid program to provide medical assistance to low-income and disabled individuals as well as low-income families with dependent children or qualified pregnant women or children. The Medicaid program is jointly funded by the federal government and the fifty states.

28. Medicaid providers, including Tenet and its subsidiaries, seek reimbursement for claims from the fifty states. The states pay the Medicaid providers and obtain federal funds from the United States Treasury. Under federal law, states are required to make DSH payments to providers, including Tenet and its subsidiaries, for providing medical assistance to a significant number of low-income patients.

29. While undocumented immigrants are not entitled to Medicaid coverage, they are nevertheless eligible for Emergency Medical Assistance ("EMA"). EMA specifically provides medical coverage for emergencies, including costs associated with the labor and delivery of children born to undocumented immigrants.

**The Federal Anti-Kickback Statute and the False Claims Act**

30. The federal Anti-Kickback statute prohibits any person from knowingly or willfully offering or paying a kickback, bribe or rebate, directly or indirectly, to any person in order to induce a referral for the furnishing or arranging for the furnishing of any item or service for which payment can be made by the Medicare and Medicaid programs. *See* 42 U.S.C. § 1320a-7(b)(2)(A)-(B).

31. In addition to criminal penalties, a violation of the Anti-Kickback statute can subject an offender to exclusion from participation in federal healthcare programs, *see* 42 U.S.C.

§ 1320a-7b(b), civil monetary penalties of up to $50,000 for each violation, *see* 42 U.S.C. § 1320a-7(a)(7), and three times the amount of remuneration paid, offered, solicited, or received regardless of whether any part of the remuneration is for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a).

32. The FCA prohibits the (a) presentment of a false claim to the federal government, (b) the use of a false statement or record to induce the federal government to pay a claim, and (c) conspiracies to induce the federal government to pay a false claim. 31 U.S.C. § 3729(a)-(b). The FCA allows the federal government to recover civil penalties from an offender of not less than $5,000 and not more than $10,000 plus three times the amount of damages that the Government has sustained because of the offender's misconduct. *Id.*

33. In addition, several states, including Georgia and South Carolina, require Medicaid providers to enter into provider agreements that mandate compliance with all federal and state laws and regulations governing the Medicaid program, and prohibit the payment or acceptance of kickbacks, bribes or rebates in exchange for referrals.

34. Tenet's Medicare and Medicaid claims were false and ineligible for reimbursement because the claims were tainted by the illegal kickback scheme. By submitting these false and fraudulent claims for Medicare and Medicaid reimbursement, Tenet violated the federal Anti-Kickback statute, the FCA, and state laws that regulate a provider's conduct regarding Medicaid. Tenet knew, especially after recently paying almost $1 billion to the Government for FCA violations, that violating these laws could result in substantial civil and criminal penalties, including the potential for treble damages, and suspension or exclusion from the Medicare and Medicaid programs.

**Overview of Tenet's Decade-Long Kickback Scheme**

35. Both before and during the Class Period, Tenet repeatedly disclosed its purported strict compliance with state and federal laws, including the federal Anti-Kickback statute that the Company admitted it violated here. This was significant because the consequences of not complying with the applicable federal and state laws is potentially devastating to a company like

Tenet, especially where it repeatedly acknowledged that violation of these laws could subject the Company to serious civil or criminal liability, and the loss of access to Medicaid and Medicare reimbursements, which accounted for a significant amount of net patient revenues earned for patient services. The following table shows the sources of the Company's net patient revenues for each year during the Class Period:

| **Net Patient Revenue** | **2016** | **2015** | **2014** | **2013** | **2012** |
|---|---|---|---|---|---|
| **Medicare** | 20.5% | 20.4% | 22.0% | 21.8% | 23.4% |
| **Medicaid** | 8.2% | 8.7% | 9.6% | 9.0% | 8.4% |
| **Managed Care** | 61.5% | 60.6% | 58.4% | 58.1% | 57.4% |
| **Indemnity, self-pay and other** | 9.8% | 10.3% | 10.0% | 11.1% | 11.1% |

36. As Defendants admitted in the NPA, from 2000 to, at least, September 2013, Tenet, and, at least four of its hospitals in the Southeastern United States, at the direction and under the supervision of senior executives, engaged in a pervasive kickback scheme, through which Tenet paid kickbacks to Clinica in exchange for thousands of illicit referrals that allowed Tenet to fraudulently recover nearly $150 million from the Medicare and Medicaid health programs. Senior executives at the Tenet hospitals systematically violated Tenet's internal policies on compliance and internal controls regarding financial arrangements with referral sources to ensure that the decade-long kickback scheme was successful.

37. Defendants succeeded in this widespread scheme to defraud the Medicare and Medicaid programs by paying kickbacks, in the amount of $12 million, to Clinica, in exchange for referring and arranging for nearly $150 million in services to be provided to pregnant, undocumented immigrants at Tenet's hospitals located in Georgia and South Carolina, including AMC, North Fulton, Spalding Regional and Hilton Head, including telling these patients that

Tenet's hospitals were the only places they would be able to deliver their babies or receive services.

38. As admitted in the NPA, Tenet engaged in this scheme in order to fraudulently recover nearly $150 million in false claims submitted to the Medicaid and Medicare programs. At the same time, Defendants Fetter and Cancelmi engaged in insider trading, allowing them to make millions while the price of the Company's stock was artificially inflated.

**Tenet's Past Misconduct and the 2006 Corporate Integrity Agreement**

39. On June 29, 2006, the Company paid nearly a billion dollars to resolve a dispute with the United States government regarding its liability arising under the FCA for fraudulent billing practices and the payment of kickbacks to physicians in exchange for Medicare patient referrals. Pursuant to the 2006 settlement, Tenet agreed to enter into a Corporate Integrity Agreement ("CIA") with the United States, which required Tenet and its Senior Corporate Management, including the Individual Defendants, to certify in Annual Reports submitted to the OIG-HHS that Tenet was in compliance with the requirements of the Medicare and Medicaid programs, including a commitment to refrain from paying bribes and kickbacks in exchange for Medicare and Medicaid referrals.

40. Tenet's promise to comply with the CIA for five years ensured that the HHS-OIG would not immediately exclude the Company from the Medicare and Medicaid programs. Exclusion from these federal programs would undoubtedly cripple Tenet given that the Company earned billions of dollars in revenue from those federal programs.

41. The CIA required Tenet to improve its policies, procedures, and controls for contracts with referral sources to ensure compliance with the Anti-Kickback statute, required employees who reviewed or approved these contracts, including hospital CEOs and CFOs, to attend specialized training, and mandated that Tenet submit certifications from "Senior Corporate Management" to HHS-OIG on a yearly basis. These certifications required Tenet's

"Senior Corporate Management" to certify that Tenet was in compliance with the requirements of the Medicare and Medicaid programs and the CIA. Importantly, the term "Senior Corporate Management" in the CIA required that certifications be submitted by, among other executives at the regional and subsidiary level, Tenet's CEO, CFO, Chief Operating Officer, Chief Compliance Officer, Chief Medical Officer, General Counsel, Regional Vice Presidents and Regional Compliance Officers.

**Class Period Scheme**

42. Clinica is a corporation based in Norcross, Georgia that provides prenatal care to undocumented, uninsured and indigent immigrants. AMC, North Fulton and Spalding Regional were for-profit hospitals owned and operated by Tenet HealthSystem in Atlanta, Georgia, Rosewell, Georgia and Griffin, Georgia respectively. Hilton Head was a for-profit hospital owned and operated by Tenet HealthSystem in Hilton Head, Georgia.

43. The patients Clinica and the Tenet hospitals preyed on were pregnant, undocumented immigrants entitled to Medicaid coverage of healthcare costs associated with childbirth. Clinica controlled both the pregnant, undocumented immigrants and the physicians that provided them with care, and this dominion allowed Clinica to provide Tenet with a steady stream of illicit referrals. Clinica, with full knowledge of senior executives at the Tenet hospitals and senior executives at Tenet HealthSystem, deceived patients by telling them that they would not be covered by Medicaid unless they delivered newborn children at Tenet's hospitals. This, of course, put the lives of the patients and their unborn children at risk because they had to travel long distances to receive care at a Tenet hospital.

44. Clinica and senior executives at the Tenet hospitals in Georgia and South Carolina entered into sham contracts to provide certain services to the Tenet hospitals, including management services, marketing consulting services, translation services, translation management services, Medicaid eligibility determination paperwork, community outreach, educational classes and birth certificate services. In reality, the sham contracts were a ruse

designed to cover-up the kickback scheme. The services purported to be provided under these contracts were either unnecessary, duplicative of services already provided, or not provided at all.

45. Clinica was able to direct patients to Tenet hospitals with relative ease for two reasons. First, Clinica ensured that only physicians who agreed to deliver babies at Tenet hospitals would be given time slots at its prenatal care clinics. Second, Clinica was able to control its patients by assigning specific doctors to them. To fulfill this goal, Clinica lied to expectant mothers and told them Medicaid would cover the costs of childbirth only if they delivered their babies at one of the Tenet hospitals. Senior Executives at Tenet HealthSystem and the Tenet hospitals were aware of Clinica's deceptive misconduct.

46. Senior executives at Tenet HealthSystem and the Tenet hospitals made payments to Clinica without valid contracts in place or without supporting documentation in violation of Company policies regarding compliance and internal controls associated with the disbursement of funds to referral sources like Clinica.

47. Senior executives at Tenet HealthSystem and the Tenet hospitals also knowingly or recklessly submitted false certifications to HHS-OIG under the CIA from 2008 to 2013.

48. No later than December 2009, Tenet was on notice of the scale of this vast conspiracy to violate the Anti-Kickback statute and the FCA because a whistleblower filed a sealed *qui tam* complaint against the Company for knowingly entering into sham contracts with Clinica in exchange for patient referrals, which was concealed from the public until July 31, 2013.

49. The decade-long kickback scheme allowed the Tenet hospitals to receive more than $125 million from the Medicaid program in Georgia and South Carolina and more than $20 million in Medicare DSH funds. Specifically, AMC received over $74 million in Georgia Medicaid funds and over $10 million in Medicare DSH funds. North Fulton received over $48 million in Georgia Medicaid funds and over $12 million in Medicare DSH funds. Hilton Head received over $4 million in South Carolina Medicaid funds. Spalding Regional received nearly

$10,000 in Georgia Medicaid funds. The Tenet hospitals submitted tens of thousands of false Medicaid claims to the Georgia and South Carolina Medicaid programs.

**The Kickback Scheme at North Fulton**

50. From 2000 to 2006, Holland served as the CEO of North Fulton hospital. In 2006, Tenet promoted him to be the Senior Vice President of Operations ("SVP of Operations") for Tenet HealthSystem, where he remained until the fall of 2013. As the SVP of Operations at Tenet HealthSystem, Holland was responsible for overseeing the operations of all Tenet hospitals in the Southern States Region, and he conspired with senior executives at the Tenet hospitals to perpetuate the kickback scheme throughout his tenure.

51. As early as June 2002, Holland knew that Clinica's referral business was very profitable to the hospital because of the extremely high Medicare and Medicaid reimbursement rates. For this reason, he ignored complaints from doctors who raised concerns about Clinica's unethical practice of diverting patients to North Fulton. For example, in April of 2002, a doctor who provided care at one of Clinica's prenatal clinics wrote an email to Holland, in which he complained about the disruption associated with a patient being diverted by Clinica from another hospital to North Fulton, and expressed concern about the appearance of a link between the services provided by Clinica and patient referrals made to North Fulton.

52. In April 2005, Tenet HealthSystem hired a company called Dr. Tango to perform an assessment of the services provided by Clinica to North Fulton. Dr. Tango concluded that Clinica's interpreters did not maintain utilization statistics, and that Clinica did not require them to be trained or evaluate their performance. Dr. Tango recommended that North Fulton should retain only trained and competent interpreters, but Holland deliberately failed to implement Dr. Tango's recommendations.

53. In February 2006, a contract administrator sent Holland a long list of marketing items that Clinica stated it performed in the last six months. The list consisted of fraudulent representations made by Clinica regarding the attendance of health fairs at locations that did not

exist or health fairs that never occurred. Holland failed to investigate or terminate North Fulton's relationship with Clinica.

54. In 2006, Holland was promoted to SVP of Operations at Tenet HealthSystem. In that capacity, Holland and Tenet HealthSystem's Regional Vice President of Finance Operations closely monitored North Fulton's relationship with Clinica, and examined whether the cost of the kickback scheme was economically feasible in exchange for the volume of deliveries.

55. Throughout 2008, lower-level employees at North Fulton informed senior executives at the hospitals regarding serious problems associated with Clinica staff present at the hospital, who were supposed to provide the specific services under North Fulton's sham contract with Clinica.

56. In November 2008, North Fulton's Chief Human Resources Officer proposed testing the competency of Clinica's interpreters to determine whether they should be allowed to work at the hospital. A senior executive at North Fulton decided to exclude Clinica employees from undergoing a competency evaluation even though Spanish interpreters provided by other companies were required to be evaluated.

57. In August 2009, a senior executive at North Fulton was informed by the hospital's Director of Women's Health Services department that Clinica appeared to bill for services that were provided by other prenatal service providers for free.

58. In November 2009, a North Fulton senior executive suggested that the hospital procure translation services from elsewhere in light of certain rules that required translators to be certified in medical translation, even though Clinica purportedly provided translation services to North Fulton pursuant to its sham contract.

59. On August 19, 2010, a North Fulton employee specifically informed a senior executive at the hospital that Clinica pressured a patient to deliver at North Fulton by misleading the patient to believe that Medicaid coverage was available only at Tenet hospitals.

60. In November, 2010, Holland and senior executives at North Fulton expressed concern that the amount of the kickback paid to Clinica was not yielding the expected volume of deliveries in return at the hospital.

61. Between January 2013 and September 2013, North Fulton executives, under Holland's direction and supervision, paid Clinica $158,743 in exchange for referring pregnant, undocumented immigrants to the hospital.

62. From November 2001 to September 2013, the payment of kickbacks to Clinica were authorized by Holland and other senior executives at North Fulton without supporting documentation in violation of Tenet's compliance policies and internal controls.

**The Kickback Scheme at AMC**

63. On June 14, 2001, AMC's sham contract with Clinica for the purported services allegedly provided to the hospital expired. AMC's senior executives continued to pay kickbacks to Clinica each month for, at least, a year despite the fact that the arrangement violated the Company's compliance policies and internal controls regarding referral arrangements.

64. In May 2002, AMC agreed to allow Clinica to provide translation services without conducting due diligence and without soliciting bids from other service providers to determine whether Clinica was fit to provide the purported services.

65. On May 3, 2002, AMC allowed Clinica to provide translation services without seeking legal approval from Tenet's in house lawyers, in violation of Tenet's policies on compliance and internal controls regarding referral arrangements.

66. In June 2003, AMC's contract with Clinica again expired. AMC executives continued to pay kickbacks to Clinica in exchange for referrals despite the fact that the absence of a contractual agreement violated the Company's policies on compliance and internal controls.

67. In April 2004, Tenet audited AMC and sent copies of the audit reports to AMC executives. The audit concluded that AMC had violated Tenet's policies on compliance and internal controls by engaging with Clinica without a valid contract in place.

68. In May or June 2004, Tenet's in house lawyers instructed AMC executives to take remedial measures regarding Clinica's expired contract. AMC executives told Tenet's in house lawyers that they would terminate the relationship with Clinica. Based on this information, Tenet's legal personnel closed out the compliance matter. AMC executives, however, continued to pay kickbacks to Clinica in exchange for referrals for several years after the compliance matter was closed by Tenet's in house lawyers.

69. In March 2005, Dr. Tango recommended that AMC should request Clinica to provide utilization statistics, and that AMC should hire only trained interpreters from Clinica and require them to submit to performance evaluations. AMC failed to implement Dr. Tango's recommendations.

70. In January 2008, an AMC executive explicitly informed Tenet HealthSystem's Regional Vice President of Finance Operations that AMC was able to choose the physicians that delivered newborn children of undocumented immigrants because of AMC's special arrangement with Clinica.

71. In September 2008, Holland and senior executives at AMC expressed concern that the kickback scheme was not as productive as it had been in the past because the volume of deliveries in exchange for kickbacks had decreased.

72. In April and May 2011, AMC executives and Tenet HealthSystem's Regional Vice President of Finance Operations again expressed concern that the number of expected deliveries at AMC continued to decline despite the kickback arrangement with Clinica, and expressed concern that Clinica may be diverting patients to another hospital.

73. In November 2011, AMC informed Tenet HealthSystem's Regional Vice President of Finance Operations that a decline in patient referrals from Clinica may be due to the enactment of an unspecified immigration law.

74. AMC continued to pay kickbacks to Clinica in exchange for referring pregnant, undocumented immigrants to the hospital, at least, until June 2012 without a valid contract in

place or without supporting documentation or inadequate documentation, in violation of Tenet's policies on compliance and internal controls regarding referral agreements.

75. In May 2012, the OIG-HHS issued a comprehensive subpoena demanding that Tenet produce documents regarding the kickback scheme in its Southern States Region. Tenet *withheld* the existence of this subpoena from investors until February 26, 2013—nearly nine months later.

76. On July 5, 2012, a senior executive at AMC sent the following email to Clinica:

> "the OIG has made numerous documentation requests of us in their subpoena. One of their requests was for documentation of the time the translators worked here at AMC. Apparently, we did not have them clock in or sign time sheets. I was wondering if you had any documentation of their time that you perhaps used as a basis to pay them? I am not asking that you provide it to us at this time. I am just wondering if some documentation of the translators['] hours worked exists. Please let me know."

**The Kickback Scheme at Hilton Head and Spalding Regional**

77. On May 18, 2006, a senior executive at Hilton Head informed Holland that the hospital would seek to grow revenues by entering into the kickback arrangement with Clinica at the end of the summer of 2006.

78. On January 25, 2007, the owner of Clinica told a Hilton Head executive that documentation to support the sham contract could not be provided to Tenet's legal department because Clinica was not able to adequately justify all of the aspects of the contract.

79. On March 20, 2007, the Director of Women's Services at Hilton Head sent an email to Clinica's owner expressing concern about the documentation required to support the kickbacks. Clinica's owner responded that Tenet did not require Clinica to provide such documentation in the last eight years. Clinica's owner further stated that Clinica was not required to provide invoices for any of its sham contracts with other Tenet hospitals either.

80. On April 5, 2007, the Director of Women's Services discussed the lack of documentation with Hilton Head's CFO and COO, and informed Clinica's owner that daily worksheets completed by Clinica's staff to support the invoices were no longer required.

81. On January 10, 2008, a paralegal in Tenet's legal department sent an email to a contract analyst at Hilton Head, in which the paralegal questioned why Hilton Head paid Clinica more than it would cost the hospital to procure the alleged services provided under the sham contract.

82. On September 24, 2008, Hilton Head executives shared a presentation amongst themselves, which showed that the kickback arrangement with Clinica resulted in a significant market share shift from a competing hospital.

83. Between 2007 and 2011, Hilton Head received at least $4 million from South Carolina's Medicaid program largely due to over 700 referrals from Clinica.

84. On November 21, 2003, a regional executive at Tenet told a senior executive at Spalding Regional that Spalding Regional should use North Fulton's contract with Clinica as a template to enter into a sham contract with Clinica.

85. In 2004, Spalding Regional received $10,000 from the Georgia Medicaid program based on 4 patient referrals from Clinica.

***Qui Tam* Action**

86. On December 1, 2009, a whistleblower named Ralph D. Williams ("Williams") filed a *qui tam* complaint against Tenet. Williams alleged that Tenet conspired with Clinica to violate the FCA, the Georgia False Medicaid Claims Act, and the Federal Anti-Kickback statute by knowingly entering into sham contracts with Clinica in exchange for patient referrals. Williams further alleged that Tenet violated federal and state laws because it submitted false certifications to the Medicare and State Medicaid programs that Tenet and its subsidiaries were in compliance with the requirements of the Medicare and State Medicaid programs, including the federal Anti-Kickback statute.

87. The *qui tam* action was sealed, and therefore, the details of such were concealed from investors until July 31, 2013, when the Court unsealed the action.

**Non-Prosecution Agreement**

88. On September 30, 2016, the Fraud Section of the DOJ agreed to enter into the NPA based on Tenet HealthSystem's and Tenet's engagement in remedial measures, including improvement in its compliance program to monitor and audit referral sources, divestment of their interest in AMC, North Fulton and Spalding Regional, a commitment to continue to enhance compliance, ethics, and Tenet's internal controls, and the promise to retain an independent compliance monitor to help enforce, implement and maintain an adequate compliance and ethics program and internal controls.

89. In the NPA, Tenet HealthSystem and Tenet expressly agreed not to contradict the facts described in the Statement of Facts attached to the NPA in any subsequent litigation. The vast majority of facts recited in the CAC at ¶¶ 2-90 are taken directly from the Statement of Facts attached to the NPA.

90. On January 25, 2017, Holland was indicted in the Southern District of Florida on one count of mail fraud, one count of healthcare fraud, and two counts of major fraud against the United States.

**Insider Sales**

91. At all relevant times during the Class Period (February 28, 2012 to August 1, 2016), Defendants Fetter and Cancelmi had a substantial financial interest in maintaining the market price of Tenet common stock. Fetter and Cancelmi received substantial quantities of Tenet stock options as a portion of their compensation packages.

92. During the Class Period, Fetter sold shares of common stock for at least $38,737,323.60 in proceeds in increasing percentages of his total stock holdings. Specifically, year-by-year, Fetter's sales were as follows.

93. In 2012, Fetter sold an aggregate of 110,320 shares of common stock which comprised 5.84% of the 1,889,233 common shares Fetter held as of March 14, 2012, as reported in Tenet's Proxy filed on March 30, 2012. Specifically, on November 27, 2012, Fetter sold 20,599 shares for $28.16, with proceeds of $580,067.84. On November 26, 2012, Fetter sold

89,721 shares at $28.01 for proceeds of $2,513,085.21. Collectively, Fetter's sales in 2012 brought in $3,093,153.05 in proceeds.

94. In 2013, Fetter sold an aggregate of 138,255 shares of common stock which comprised 14.23% of the 971,466 common shares Fetter held as of March 11, 2013, as reported in Tenet's Proxy filed on March 22, 2013. Specifically, on March 4, 2013, Fetter sold 1,700 shares at $39.88, and 122,777 shares at $39.37 for proceeds of $4,901,526.49, and 13,778 shares at $39.49 for proceeds of $544,093.22. Collectively, Fetter's sales in 2013 brought in $5,445,619.71 in proceeds.

95. In 2014, Fetter sold an aggregate of 238,486 shares of common stock which comprised 22.41% of the 1,064,168 common shares Fetter held as of March 12, 2014, as reported in Tenet's Proxy filed on March 28, 2014. Specifically, on April 25, 2014, Fetter sold 57,735 shares at $45 for proceeds of $2,598,075. On May 22, 2014, Fetter sold 26,096 shares and 9,298 shares for $47.52 and $47.51 respectively for proceeds of $1,681,829.90. On June 6, 2014, Fetter sold 25,339 shares at $50.06 for proceeds of $1,268,470.34. On July 25, 2014, Fetter sold 41,000 shares at $51.34 for proceeds of $2,104,940. On August 6, 2014, Fetter sold 117,333 shares at $55.93 for proceeds of $ $6,562,434.69. On August 7, 2014, Fetter sold 21,332 shares at $57.14 for proceeds of $ 1,218,910.48. On August 18, 2014, Fetter sold 33,642 shares at $60.01 for proceeds of $2,018,856.42. Collectively, Fetter's sales in 2014 brought in $17,453,516.80 in proceeds.

96. In 2015, Fetter sold an aggregate of 360,626 shares of common stock which comprised 38.66% of the 932,603 common shares Fetter held as of March 11, 2015, as reported in Tenet's Proxy filed on March 27, 2015. Specifically, on May 18, 2015, Fetter sold 44,991 shares at $50, for proceeds of $2,249,550. On June 25, 2015, Fetter sold 47,711 shares at $55.02 for proceeds of $2,625,059.22. On July 6, 2015, Fetter sold 27,703 shares at $60.02 for proceeds of $1,662,734.06. On July 13, 2015, Fetter sold 300 shares at $60.07 for proceeds of $18,021 and 87,704 shares at $60.08 for proceeds of $5,269,256.32. On July 14, 2015, Fetter sold 56,997 shares at $60.24 for proceeds of $3,433,499.28. These suspicious sales all occurred

after Tenet's May 4, 2015, Form 10-Q disclosing that on April 10, 2015 the DOJ informed the Company that four Tenet hospitals had been designated as targets of the government's criminal investigation. Collectively, Fetter's stock sales in 2015 brought in $ 15,258,119.90 in proceeds.

97. During the Class Period, Cancelmi sold an aggregate of 12,991 shares of common stock at $56.88, on August 8, 2014, for $738,928.08 in proceeds.

98. Fetter and Cancelmi did not sell any common shares on the market from August 1 2008 to the beginning of the Class Period on February 28, 2012.

99. The Individual Defendants owned the following number of shares and options during the Class Period, inclusive of deferred compensation invested in stock units:

| Holdings as of (per Proxy) | Fetter stock | Fetter options | Cancelmi Stock | Cancelmi options | Porter stock | Porter options |
|---|---|---|---|---|---|---|
| September 7, 2011 | 1,609,763 | 8,672,115 | 0 | 0 | 400,205 | 1,285,631 |
| March 14, 2012 | 1,889,233 | 10,645,535 | 0 | 0 | 491,569 | 1,690,013 |
| March 11, 2013 | 971,466 | 1,281,738 | 56,249 | 16,457 | 0 | 0 |
| March 12, 2014 | 1,064,168 | 1,149,737 | 74,849 | 24,791 | 0 | 0 |
| March 11, 2015 | 932,603 | 1,105,238 | 104,695 | 25,000 | 0 | 0 |
| March 14, 2016 | 893,735 | 1,094,158 | 144,849 | 54,688 | 0 | 0 |

**Tenet's Materially False and Misleading Financial Reports**

100. Promulgated by the Financial Accounting Standards Board ("FASB"), GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

101. SEC and NYSE rules and regulations require that publicly traded companies such as Tenet include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

102. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

103. Under GAAP, a contingent liability or loss contingency is "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶ 1 (1975) (FAS 5); ASC 450-20-20. (FAS 5 was codified as ASC 450, Contingencies, in the FASB Accounting Standards Codification, which became the official single source of authoritative nongovernmental U.S. Generally Accepted Accounting Principles on July 1, 2009, and was effective for interim and annual periods ending after September 15, 2009. Hereinafter, FAS 5 is referred to as ASC 450.)

104. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. ASC 450 "uses the terms probable, reasonably possible, and remote" to identify three areas within that range, as follows:

a. Probable. The future event or events are likely to occur.

b. Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely.

c. Remote. The chance of the future event or events occurring is slight.

ASC 450-20-20.

105. Examples of loss contingencies include pending or threatened litigation, and actual or possible claims and assessments. ASC 450-20-05-10. Actual or possible claims and assessments include those imposed by governmental entities.

106. An estimated loss from a loss contingency must be accrued by a charge to income on a company's financial statements if: 1) before the financial statements are issued (or are available to be issued), there is available information indicating that the impairment of an asset or incurrence of liability is probable and 2) the amount of loss can be reasonably estimated. ASC 450-20-25-2.

107. Under ASC450, "if some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." Disclosure of an additional amount of exposure to loss is required if there is a reasonable possibility that the additional loss will be incurred. ASC 450-20-30-1; ASC 450-20-50-3b.

108. Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still may need to be disclosed in the financial statements. ASC 450.

109. ASC 450 requires the issuer to disclose a loss contingency if there is at least a reasonable possibility that a loss may have been incurred (i.e., the possibility of a loss is more than "remote"). ASC 450-20-50-3.

110. Where the loss contingency is less than probable, but not remote, the disclosure shall include "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-4.

111. Consequently, where a governmental agency manifests an awareness of a reasonably possible and material claim against a company, that company must disclose in the financial statements "the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made." ASC450-20-50-6.

112. The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

113. For each quarterly and annual reporting period from February 28, 2012 through August 1, 2016, Defendants violated GAAP by failing to, at least, give an estimate of the amount of possible loss or range of loss in its financial statements thereby depriving investors of the material fact that should the loss occur, Tenet would, at a minimum, pay tens of millions of dollars in connection with the violations related to the DOJ investigation.

114. Over the course of the decade-long conspiracy, Tenet received over $146 million in revenue from Medicare and Medicaid payments for the illicit referrals. AMC received an illicit profit of $39,897,696 and North Fulton received an illicit profit of $31,966,451, as a direct result of the kickback scheme. Tenet knew that the DOJ's minimum fine would be based on the amount of illegal profits or revenues earned by the Company, while also knowing that it had filed tens of thousands of false claims with the government, each of which could bring with it a fine of, at least $5,000 to $10,000. Thus, the low end of the range of loss was nearly $72 million or AMC's illicit profit $39,897,696 combined with North Fulton's illicit profit of $31,966,451. Because both the FCA and the Anti-Kickback statute impose treble damages on violators, or three times the actual damages sustained by the Government, the minimum amount for the high end of the range of Tenet's loss was $438 million.

115. The OIG-HHS's subpoena issued in May 2012 provided the Defendants with precise details of the underlying transactions and conduct that the Government was investigating as the investigation and scope developed. At this time, Tenet was also aware that it had directed and participated in the kickback scheme, and had submitted false claims under the Medicare and Medicaid programs.

116. From February 28, 2012 to February 26, 2013, the Tenet Defendants blatantly violated GAAP by withholding from investors, in Tenet's quarterly and annual public filings with the SEC, the existence of the subpoena and the full scope of the government's investigation, and failed to disclose a potential range of loss in connection with the kickback scheme.

117. From February 26, 2013 to February 22, 2016, Defendants violated GAAP because they failed to disclose, in Tenet's quarterly and annual filings with the SEC, that the minimum amount of the range of loss was, at least, $72 million and that the high end of the range of potential loss was, at a minimum, $438 million. Defendants instead told investors that they had reserved only $20 million for the potential liability arising out of the Clinica referral scheme, and misled investors to believe that the potential loss was several hundred million dollars lower than it actually could have been.

118. On February 22, 2016, Tenet suddenly and dramatically increased the reserve against the liability of the Clinica referral scheme from $20 million to $238 million in an Annual Report filed with the SEC for the period ending December 31, 2015. On May 2, 2016, Tenet again suddenly and dramatically increased the reserve to resolve the Clinica matter from $238 million to $407 million in its Quarterly Report filed with the SEC for the period ending March 31, 2016. These eleventh hour announcements were made based on the amount that Tenet then expected the government to accept to resolve the matter as opposed to an assessment based on GAAP that was dispositive of the Company's obligations to have previously disclosed material information under the securities laws. In any event, Tenet's settlement offers were repeatedly rejected by the Government.

**Tenet Failed to Maintain an Adequate System of Internal Controls**

119. Throughout the Class Period, Tenet consistently touted the sufficiency of its internal financial controls and procedures based on the standards set forth by the Committee Sponsoring Organizations of the Treadway Commission ("COSO"). Between February 28, 2012 and February 22, 2016, Tenet affirmatively misrepresented in its Annual Reports filed with the SEC on Form 10-K that, based on an assessment using the COSO framework, the Company's

internal control over financial reporting was effective. Tenet's assurances were materially false and misleading because the Company repeatedly filed false and misleading financial statements that failed to contain appropriate disclosures regarding the Company's deficient compliance program, and failed to ensure that its financial statements filed with the SEC contained adequate disclosures regarding the loss contingency associated with its federal law violations.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

120. The Class Period begins on February 28, 2012 when Tenet filed an Annual Report in a Form 10-K with the SEC for the period ending December 31, 2011, in which the Company made the following materially false and misleading statements about its compliance program and policies:

> In accordance with our ethics and compliance program, which is described in detail under "Compliance and Ethics" below, we have policies and procedures in place concerning compliance with the Anti-kickback Statute and the Stark law, among others. ***In addition, our ethics and compliance, law and audit services departments systematically review a substantial number of our arrangements with referral sources to determine the extent to which they comply with our policies and procedures and with the Anti-kickback Statute, the Stark law and similar state statutes.***
>
> . . .
>
> **COMPLIANCE AND ETHICS**
>
> *General*. Our ethics and compliance department maintains our multi-faceted, values-based ethics and compliance program, which is designed to (1) help staff in our corporate and Conifer offices, hospitals, outpatient centers and physician practices ***meet or exceed applicable standards established by federal and state laws and regulations, as well as industry practice, and (2) monitor and raise awareness of ethical issues among employees and others, and stress the importance of understanding and complying with our Standards of Conduct.*** The ethics and compliance department operates with independence —it has its own operating budget; it has the authority to hire outside counsel, access any Tenet document and interview any of our personnel; and our chief compliance officer reports directly to the quality, compliance and ethics committee of our board of directors.

*Program Charter*. Following the expiration of our five-year Corporate Integrity Agreement (the "CIA") with the OIG on September 27, 2011, the quality, compliance and ethics committee of our board of directors approved an updated Q*uality, Compliance and Ethics Program Charter* intended to continue certain of the safeguards implemented by the CIA and, among other things:

- support and maintain our present and future responsibilities with regard to participation in federal health care programs; and

- further our goals of (1) fostering and maintaining the highest ethical standards among all employees, officers and directors, physicians practicing at Tenet facilities and contractors that furnish health care items or services, and (2) valuing our compliance with all state and federal laws and regulations as a foundation of our corporate philosophy.

The primary focus of our quality, compliance and ethics program is compliance with the requirements of Medicare, Medicaid and other federally funded health care programs. Pursuant to the terms of the charter, our ethics and compliance department is responsible for the following activities: (1) annually assessing, critiquing and (as appropriate) drafting and distributing company policies and procedures; (2) developing, providing and tracking ethics training for all employees, directors, contractors and agents; (3) developing, providing and tracking job-specific training to those who work in clinical quality, coding, billing, cost reporting and referral source arrangements; (4) developing, providing and tracking annual training on ethics and clinical quality oversight to the members of each hospital governing board; (5) creating and disseminating the company's Standards of Conduct and obtaining certifications of adherence to the Standards of Conduct as a condition of employment; (6) maintaining and promoting Tenet's Ethics Action Line, which allows confidential reporting of issues on an anonymous basis and emphasizes Tenet's no retaliation policy; (7) responding to and resolving all compliance-related issues that arise from the Ethics Action Line and compliance reports received from our facilities, hospital compliance officers or any other source; (8) ensuring that appropriate corrective and disciplinary actions are taken when non-compliant conduct or improper contractual relationships are identified; ***(9) monitoring and measuring the Company's adherence to all applicable Tenet policies and legal and regulatory requirements related to federal health care programs; (10) directing an annual screening of individuals for exclusion from federal health care program participation as required by federal regulations; (11) maintaining a database of all arrangements involving the payment of anything of value between Tenet and any physician or other actual or potential source of health care business or referrals to or from Tenet; and (12) overseeing annual audits of clinical quality, referral source arrangements, outliers, charging, coding, billing and other compliance risk areas as may be identified from time to time.***

121. The Form 10-K filed with the SEC for the period ending December 31, 2011 was signed by Defendants Fetter and Porter, and contained Sarbanes-Oxley required certifications ("SOX Certification") signed by Defendants Fetter and Porter. The SOX Certifications stated that:

> The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

122. The statement identified in paragraphs 120-121 was materially false and misleading when made because Tenet (a) was then engaged in a widespread scheme to pay kickbacks to Clinica from 2000 until, at least, September 2013, in exchange for patient referrals to AMC, North Fulton, Hilton Head and Spalding Regional; (b) was in violation of the 2006 CIA because Tenet's Senior Corporate Management, including Defendant Fetter and Defendant Porter, falsely certified that Tenet was in compliance with the Anti-Kickback statute and all applicable federal and state laws; (c) failed to prevent senior executives from systematically, repeatedly, and easily circumventing Tenet's internal policies on compliance, ethics and internal controls to perpetuate the kickback scheme; (d) failed to "systematically review" Tenet's compliance with the Anti-Kickback statute; (e) failed to meet the minimum standards of compliance, ethics and internal controls established by the Company to ensure compliance with federal and state laws and industry practice; (f) failed to monitor and measure the Company's

adherence to internal policies and legal regulatory requirements related to the Medicare and Medicaid programs; and (g) failed to conduct a proper and adequate audit of the referral arrangement between Clinica and the Tenet hospitals in Georgia and South Carolina to ferret out the decade-long kickback scheme to defraud the Medicare and Medicaid programs.

123. Defendants also made the following materially false and misleading statements regarding the Company's internal controls in a Form 10-K filed with the SEC for the period ending December 31, 2011:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended. Management assessed the effectiveness of Tenet's internal control over financial reporting as of December 31, 2011. This assessment was performed under the supervision of and with the participation of management, including the chief executive officer and chief financial officer.
>
> In making this assessment, management used criteria based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on the assessment using the COSO framework, management concluded that Tenet's internal control over financial reporting was effective as of December 31, 2011.

124. The statement identified in paragraph 123 was materially false and misleading when made because (a) Tenet failed to establish sufficient and effective internal controls over the Company's financial reporting; and (b) failed to comply with GAAP by violating ASC 450 because the Company failed to disclose the loss contingency associated with the Clinica referral scheme as a result of its violation of the Anti-Kickback statute and the FCA, and its failure to adequately reserve for such a loss.

125. Tenet repeated the materially false and misleading statements identified in paragraph 123 in its Annual Reports filed with the SEC for the fiscal years ending in 2012, 2013, 2014 and 2015.

126. On August 7, 2012, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, in which the Company made the following materially false and misleading statements about its loss contingencies:

> ***In accordance with ASC 450, "Contingencies," and related guidance, we record accruals for estimated losses relating to claims and lawsuits when available information indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. Where a loss on a material matter is reasonably possible and estimable, we disclose an estimate of the loss or a range of loss. In cases where we have not disclosed an estimate, we have concluded that the loss is either not reasonably possible or the loss, or a range of loss, is not reasonably estimable, based on available information.***
>
> . . .
>
> ***Our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. However, based on currently available information, as of June 30, 2012, we had recorded reserves of approximately $2 million in the aggregate with respect to two hospitals under review in the foregoing governmental proceedings.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.
>
> . . .
>
> For the six months ended June 30, 2012 and 2011, we recorded net costs of $3 million and $19 million, respectively. The 2012 amount primarily related to costs associated with the legal proceedings and governmental reviews described above. The 2011 amount primarily related to costs associated with our evaluation of an unsolicited acquisition proposal received in November 2010 (which was subsequently withdrawn), the settlement of a union arbitration claim and costs to defend the Company in various matters.

127. The Quarterly Report filed with the SEC on August 7, 2012 was signed by Defendants Fetter, and contained his signed SOX certifications as stated in ¶ 121 above.

128. The statement identified in paragraph 126 was materially false and misleading when made because Tenet (a) failed to disclose that it received a subpoena from the OIG-HHS regarding the decade-long kickback scheme in May 2012; and (b) failed to provide a range for

the loss contingency that exceeded, at least, tens of millions of dollars on the low end (the profits Tenet had earned through the kickback scheme) and hundreds of millions of dollars on the high end (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was at least reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

129. Defendants further failed to disclose that in May 2012, the OIG-HHS issued a comprehensive subpoena demanding that Tenet produce documents from January 2004 through May 2012 regarding the relationship between Clinica and Tenet's four hospitals in the Southeast Region. Tenet knowingly withheld the existence of this subpoena from investors until February 26, 2013 even though it was likely that the Company faced severe civil and criminal liability that would materially impact its business and operations.

130. The DOJ Investigation was material to investors and was required to be disclosed immediately because Defendants knew that the investigation would reveal that Tenet's revenues were derived, in part, from the illegal kickback scheme. Moreover, Defendants' boilerplate disclosures concerning regulatory investigations generally could be understood, by a reasonable investor, as a denial that Tenet was then being actively investigated for violations of the federal Anti-Kickback statute and the FCA with respect to the Clinica matter. Third, based on Defendants' knowing and willful violations of the federal Anti-Kickback statute, including but

not limited to their failure to maintain adequate compliance programs, internal controls and accurate books and records, Defendants knew upon receipt of the subpoena that it was probable, and undoubtedly reasonably possible, that the DOJ Investigation would result in the imposition of fines and penalties and would have a material impact on Tenet's business, operations, and finances.

131. On November 7, 2012, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, in which the Company made the following materially false and misleading statements about its loss contingencies:

> ***In accordance with ASC 450, "Contingencies," and related guidance, we record accruals for estimated losses relating to claims and lawsuits when available information indicates that a loss is probable and the amount of the loss, or range of loss, can be reasonably estimated. Where a loss on a material matter is reasonably possible and estimable, we disclose an estimate of the loss or a range of loss. In cases where we have not disclosed an estimate, we have concluded that the loss is either not reasonably possible or the loss, or a range of loss, is not reasonably estimable, based on available information.***
>
> . . .
>
> ***Our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. Based on currently available information, as of September 30, 2012, we had recorded reserves of approximately $2 million in the aggregate with respect to two hospitals under review in the foregoing governmental proceedings.*** These reserves have not changed from the amounts reported for the three months ended June 30, 2012; however, changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.
>
> . . .
>
> For the nine months ended September 30, 2012 and 2011, we recorded net costs of $3 million and $24 million, respectively. The 2012 amount primarily related to costs associated with the legal proceedings and governmental reviews described above. The 2011 amount primarily related to costs associated with our evaluation of an unsolicited acquisition proposal received in November 2010 (which was subsequently withdrawn), the settlement of a union arbitration claim and costs to defend the Company in various matters.

132. The Quarterly Report filed with the SEC on November 7, 2012 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

133. The statements identified in paragraph 131 were materially false and misleading when made because Tenet (a) failed to disclose that it received a subpoena from the OIG-HHS regarding the decade-long kickback scheme in May 2012; and (b) failed to provide a range for the loss contingency that exceeded, at least, tens of millions of dollars on the low end (the profits Tenet had earned through the kickback scheme) and hundreds of millions of dollars on the high end (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

134. On February 26, 2013, Tenet filed an Annual Report in a Form 10-K with the SEC, in which the Company made the following materially false and misleading statements about its compliance program and policies:

> In accordance with our ethics and compliance program, which is described in detail under "Compliance and Ethics" below, we have policies and procedures in place concerning compliance with the Anti-kickback Statute and the Stark law, among others. ***In addition, our ethics and compliance, law and audit services departments systematically review a substantial number of our arrangements with referral sources to determine the extent to which they comply with our policies and procedures and with the Anti-kickback Statute, the Stark law and similar state statutes.***
>
> . . .

**COMPLIANCE AND ETHICS**

*General*. Our ethics and compliance department maintains our multi-faceted, values-based ethics and compliance program, which is designed to (1) help staff in our corporate and Conifer offices, hospitals, outpatient centers and physician practices ***meet or exceed applicable standards established by federal and state laws and regulations, as well as industry practice, and (2) monitor and raise awareness of ethical issues among employees and others, and stress the importance of understanding and complying with our Standards of Conduct.*** The ethics and compliance department operates with independence —it has its own operating budget; it has the authority to hire outside counsel, access any Tenet document and interview any of our personnel; and our chief compliance officer reports directly to the quality, compliance and ethics committee of our board of directors.

*Program Charter*. Following the expiration of our five-year Corporate Integrity Agreement (the "CIA") with the OIG on September 27, 2011, the quality, compliance and ethics committee of our board of directors approved an updated Q*uality, Compliance and Ethics Program Charter* intended to continue certain of the safeguards implemented by the CIA and, among other things:

- support and maintain our present and future responsibilities with regard to participation in federal health care programs; and

- further our goals of (1) fostering and maintaining the highest ethical standards among all employees, officers and directors, physicians practicing at Tenet facilities and contractors that furnish health care items or services, and (2) valuing our compliance with all state and federal laws and regulations as a foundation of our corporate philosophy.

The primary focus of our quality, compliance and ethics program is compliance with the requirements of Medicare, Medicaid and other federally funded health care programs. Pursuant to the terms of the charter, our ethics and compliance department is responsible for the following activities: (1) annually assessing, critiquing and (as appropriate) drafting and distributing company policies and procedures; (2) developing, providing and tracking ethics training for all employees, directors, contractors and agents; (3) developing, providing and tracking job-specific training to those who work in clinical quality, coding, billing, cost reporting and referral source arrangements; (4) developing, providing and tracking annual training on ethics and clinical quality oversight to the members of each hospital governing board; (5) creating and disseminating the company's Standards of Conduct and obtaining certifications of adherence to the Standards of Conduct as a condition of employment; (6) maintaining and promoting Tenet's Ethics Action Line, which allows confidential reporting of issues on an anonymous basis and emphasizes Tenet's no retaliation policy; (7) responding to and resolving all compliance-related issues that arise from the

> Ethics Action Line and compliance reports received from our facilities, hospital compliance officers or any other source; (8) ensuring that appropriate corrective and disciplinary actions are taken when non-compliant conduct or improper contractual relationships are identified; ***(9) monitoring and measuring the Company's adherence to all applicable Tenet policies and legal and regulatory requirements related to federal health care programs; (10) directing an annual screening of individuals for exclusion from federal health care program participation as required by federal regulations; (11) maintaining a database of all arrangements involving the payment of anything of value between Tenet and any physician or other actual or potential source of health care business or referrals to or from Tenet; and (12) overseeing annual audits of clinical quality, referral source arrangements, outliers, charging, coding, billing and other compliance risk areas as may be identified from time to time.***

135. The statements identified in paragraph 134 were materially false and misleading when made because Tenet (a) was then engaged in a widespread scheme to pay kickbacks to Clinica from 2000 until, at least, September 2013, in exchange for patient referrals to AMC, North Fulton, Hilton Head and Spalding Regional; (b) failed to disclose that it violated the 2006 CIA because Tenet's Senior Corporate Management, including the Individual Defendants, falsely certified that Tenet was in compliance with the Anti-Kickback statute and all applicable federal and state laws from 2006-2011; (c) failed to prevent senior executives from systematically, repeatedly, and easily circumventing Tenet's internal policies on compliance, ethics and internal controls to perpetuate the kickback scheme; (d) failed to "systematically review" Tenet's compliance with the Anti-Kickback statute; (e) failed to meet the minimum standards of compliance, ethics and internal controls established by the Company to ensure compliance with federal and state laws and industry practice; (f) failed to monitor and measure the Company's adherence to internal policies and legal regulatory requirements related to the Medicare and Medicare programs; and (g) failed to conduct a proper and adequate audit of the referral arrangement between Clinica and the Tenet hospitals in Georgia and South Carolina to ferret out the decade-long kickback scheme to defraud the Medicare and Medicaid programs.

136. In the Annual Report filed on February 26, 2013, the Company also made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Review of Arrangements with Local Service Provider*. We received a subpoena from the OIG in Atlanta seeking documents from January 2004 through May 2012 related to the relationship that Atlanta Medical Center, North Fulton Regional Hospital, South Fulton Medical Center and Spalding Regional Hospital (all located in Georgia) and Hilton Head Hospital (located in South Carolina) had with Hispanic Medical Management, Inc. ("HMM"). HMM is an unaffiliated entity that owns and operates clinics that provide, among other things, prenatal care predominately to Hispanic women. The hospitals contracted with HMM for translation services, marketing services and Medicaid eligibility assistance. The investigation is being conducted by the U.S. Attorney's Office for the Middle District of Georgia along with the Civil Division of the DOJ. We understand the government's review focuses on whether the arrangements violated the federal Anti-kickback Statute and False Claims Act. We have produced documents and information responsive to the subpoena and are cooperating with the government's review. ***At this time, we are unable to determine the potential impact, if any, that will result from the final resolution of this investigation.***
>
> Except with respect to the recently settled matter involving one hospital discussed above, our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, as of December 31, 2012, we had recorded reserves of approximately $3 million in the aggregate with respect to three hospitals under review in the foregoing governmental proceedings.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

137. The Annual Report filed with the SEC on February 26, 2013 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

138. The statements identified in paragraph 136 were materially false and misleading when made because Tenet failed to provide a range for the loss contingency that exceeded, at least, tens of millions of dollars on the low end (the profits Tenet had earned through the kickback scheme) and hundreds of millions of dollars on the high end (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it

was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

139. On April 30, 2013, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Review of Arrangements with Local Service Provider.*
>
> *** * * At this time, we are unable to determine the potential impact, if any, that will result from the final resolution of this investigation.***
>
> Except with respect to the recently settled matter involving one hospital discussed above, our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, as of March 31, 2013, we had recorded reserves of approximately $3 million in the aggregate with respect to three hospitals under review in the foregoing governmental proceedings.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

140. The Quarterly Report filed with the SEC on April 30, 2013 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

141. The statements identified in paragraph 139 were materially false and misleading when made because Tenet failed to provide a range for the loss contingency that exceeded, at least, tens of millions of dollars on the low end (the profits Tenet had earned through the kickback scheme) and hundreds of millions of dollars on the high end (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450,

knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

142. On August 6, 2013, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Review of Arrangements with Local Service Provider*. * * * If the qui tam action continues, we will vigorously defend the matter. ***At this time, we are unable to determine the potential impact, if any, that will result from the final resolution of this investigation.***
>
> Except for the matter settled in January 2013 involving one hospital as discussed above, our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, as of June 30, 2013, we had recorded reserves of approximately $3 million in the aggregate with respect to three hospitals under review in the foregoing governmental proceedings.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

143. The Quarterly Report filed with the SEC on August 6, 2013 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

144. The statement identified in paragraph 142 was materially false and misleading when made because Tenet failed to provide a range for the loss contingency that exceeded, at

least, tens of millions of dollars on the low end (the profits Tenet had earned through the kickback scheme) and hundreds of millions of dollars on the high end (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

145. On November 4, 2013, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Review of Arrangements with Local Service Provider*. * * * Our response to both complaints must be filed by November 11, 2013, and we intend to vigorously defend these matters. ***At this time, we are unable to determine the potential impact, if any, that will result from the final resolution of these investigations.***
>
> Except with respect to the matter settled in January 2013 involving one hospital, as discussed above, our analysis of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, as of September 30, 2013, we had recorded reserves of approximately $3 million in the aggregate with respect to three hospitals under review for their billing practices for kyphoplasty and cardiac defibrillator implantation procedures.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

146. The Quarterly Report filed with the SEC on November 4, 2013 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

147. The statement identified in paragraph 145 was materially false and misleading when made because Tenet failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

148. On February 24, 2014, Tenet filed an Annual Report in a Form 10-K with the SEC, for the period ended December 31, 2013, signed by Defendants Fetter and Cancelmi, which contained their signed SOX certifications as stated in ¶ 121 above, in which it made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action*—
>
> * * * Management has established a reserve, as described below, to reflect the current estimate of probable liability for these matters, but it is impossible at this time to predict the amount and terms of any potential resolution. We will continue to vigorously defend against the government's allegations.
>
> Except with respect to the matter settled in January 2013 involving one hospital, as discussed above, our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently***

> ***available information, as of December 31, 2013, we had recorded reserves of approximately $27 million in the aggregate for our potential reimbursement obligations with respect to 23 hospitals under review for their billing practices for kyphoplasty and cardiac defibrillator implantation procedures, as well as the Clinica de la Mama matters.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

149. In the Annual Report filed on February 24, 2014, the Company further made the following materially false and misleading statements about its compliance program and policies:

> In accordance with our ethics and compliance program, which is described in detail under "Compliance and Ethics" below, we have policies and procedures in place concerning compliance with the Anti-kickback Statute and the Stark law, among others. ***In addition, our ethics and compliance, law and audit services departments systematically review a substantial number of our arrangements with referral sources to determine the extent to which they comply with our policies and procedures and with the Anti-kickback Statute, the Stark law and similar state statutes. On the one hand, we may be less willing than some of our competitors to take actions or enter into business arrangements that do not clearly satisfy the safe harbors and exceptions to the fraud and abuse laws described above; as a result, this unwillingness may put us at a competitive disadvantage.***
>
> . . .
>
> **COMPLIANCE AND ETHICS**
>
> *General*—Our ethics and compliance department maintains our multi-faceted, values-based ethics and compliance program, which is designed to (1) help staff in our corporate and Conifer offices, hospitals, outpatient centers, health plan offices and physician practices meet or exceed applicable standards established by federal and state laws and regulations, as well as industry practice, and (2) monitor and raise awareness of ethical issues among employees and others, and stress the importance of understanding and complying with our *Standards of Conduct*. The ethics and compliance department operates with independence — it has its own operating budget; it has the authority to hire outside counsel, access any Tenet document and interview any of our personnel; and our chief compliance officer reports directly to the quality, compliance and ethics committee of our board of directors.

> *Program Charter*—In September 2011, the quality, compliance and ethics committee of our board of directors approved an updated *Quality, Compliance and Ethics Program Charter* intended to:
>
> - support and maintain our present and future responsibilities with regard to participation in federal health care programs; and
> - further our goals of (1) fostering and maintaining the highest ethical standards among all employees, officers and directors, physicians practicing at Tenet facilities and contractors that furnish health care items or services, and (2) valuing our compliance with all state and federal laws and regulations as a foundation of our corporate philosophy.
>
> The primary focus of our quality, compliance and ethics program is compliance with the requirements of Medicare, Medicaid and other federally funded health care programs. Pursuant to the terms of the charter, our ethics and compliance department is responsible for the following activities: (1) annually assessing, critiquing and (as appropriate) drafting and distributing company policies and procedures; (2) developing, providing and tracking ethics training for all employees, directors and, as applicable, contractors and agents; (3) developing, providing and tracking job-specific training to those who work in clinical quality, coding, billing, cost reporting and referral source arrangements; (4) developing, providing and tracking annual training on ethics and clinical quality oversight to the members of each hospital governing board; (5) creating and disseminating the company's *Standards of Conduct* and obtaining certifications of adherence to the *Standards of Conduct* as a condition of employment; (6) maintaining and promoting Tenet's Ethics Action Line, which allows confidential reporting of issues on an anonymous basis and emphasizes Tenet's no retaliation policy; (7) responding to and resolving all compliance related issues that arise from the Ethics Action Line and compliance reports received from our facilities, hospital compliance officers or any other source; (8) ensuring that appropriate corrective and disciplinary actions are taken when non-compliant conduct or improper contractual relationships are identified; (***9) monitoring and measuring adherence to all applicable Tenet policies and legal and regulatory requirements related to federal health care programs; (10) directing an annual screening of individuals for exclusion from federal health care program participation as required by federal regulations; (11) maintaining a database of all arrangements involving the payment of anything of value between Tenet and any physician or other actual or potential source of health care business or referrals to or from Tenet; and (12) overseeing annual audits of clinical quality, referral source arrangements, outliers, charging, coding, billing and other compliance risk areas as may be identified from time to time.***

150. On this news, Tenet's share price fell $4.40, or 9%, to close at $43.93 on February 25, 2014 on heavy trading volume. The market began to learn that Tenet's liability may be higher than the market had previously believed because the federal government's intervention in

the *qui tam* action alerted investors to the seriousness of Tenet's potential violations of federal laws that regulate the Medicare and Medicaid health programs.

151. However, the statements identified in paragraphs 148-149 were materially false and misleading when made because Tenet (a) falsely touted that its compliance program was of such superior quality that it may place Tenet at a disadvantage with competitors in the health care space in terms of referral arrangements, (b) engaged in a widespread scheme to pay kickbacks to Clinica from 2000 until, at least, September 2013, in exchange for patient referrals to AMC, North Fulton, Hilton Head and Spalding Regional; (c) failed to disclose that it violated the 2006 CIA because Tenet's Senior Corporate Management, including the Individual Defendants, falsely certified that Tenet was in compliance with the Anti-Kickback statute and all applicable federal and state laws from 2006-2011; (d) failed to prevent senior executives from systematically, repeatedly, and easily circumventing Tenet's internal policies on compliance, ethics and internal controls to perpetuate the kickback scheme; (e) failed to "systematically review" Tenet's compliance with the Anti-Kickback statute; (f) failed to meet the minimum standards of compliance, ethics and internal controls established by the Company to ensure compliance with federal and state laws and industry practice; (g) failed to monitor and measure the Company's adherence to internal policies and legal regulatory requirements related to the Medicare and Medicare programs; (h) failed to conduct a proper and adequate audit of the referral arrangement between Clinica and the Tenet hospitals in Georgia and South Carolina to ferret out the decade-long kickback scheme to defraud the Medicare and Medicaid programs; (i) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $27 million, which included potential reimbursement obligations for 19 hospitals that were unrelated to the kickback scheme; and (j) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may

result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

152. On May 5, 2014, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, in which it made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action*—
>
> * * * Management has established a reserve, as described below, to reflect the current estimate of probable liability for these matters, but it is impossible at this time to predict the amount and terms of any potential resolution. We will continue to vigorously defend against the government's allegations.
>
> Except with respect to the matter settled in January 2013 involving one hospital, as discussed above, our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, as of March 31, 2014, we had recorded reserves of approximately $28 million in the aggregate for our potential reimbursement obligations with respect to 25 hospitals under review for their billing practices for kyphoplasty and cardiac defibrillator implantation procedures, as well as the Clinica de la Mama matters.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

153. The Quarterly Report filed with the SEC on May 4, 2014, for the period ending March 31, 2014, was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

154. The statements identified in paragraph 152 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $28 million, which included potential reimbursement obligations for 21 other hospitals that were unrelated to the kickback scheme; and (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

155. On August 4, 2014, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action—*
>
> * * * Management has established a reserve, as described below, to reflect the current estimate of probable liability for these matters, but it is impossible at this time to predict the amount and terms of any potential resolution. We will continue to vigorously defend against the government's allegations.
>
> Except with respect to the matter settled in January 2013 involving one hospital, as discussed above, our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Based on currently available information, we increased our reserves by approximately $10 million in the three months ended June 30, 2014, resulting in recorded reserves of approximately $38 million in the aggregate for our potential reimbursement obligations with respect to all of the hospitals under review for their billing***

> ***practices for kyphoplasty and cardiac defibrillator implantation procedures, as well as the Clinica de la Mama matters.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

156. The Quarterly Report filed with the SEC on August 4, 2014, for the period ending June 30, 2014, was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

157. The statements identified in paragraph 155 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $38 million, which included potential reimbursement obligations for all other hospitals that were unrelated to the kickback scheme; and (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

158. On November 3, 2014, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action—*

* * *

> Except with respect to the matter settled in January 2013 involving one hospital, as discussed above, our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Management has established reserves of approximately $38 million in the aggregate for our potential obligations with respect to all of the hospitals under review for their billing practices for kyphoplasty and cardiac defibrillator implantation procedures, as well as the Clinica de la Mama matters.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

159. The Quarterly Report filed with the SEC on November 3, 2014, for the period ending September 30, 2014, was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

160. The statements identified in paragraph 158 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $38 million, which included potential reimbursement obligations for all other hospitals that were unrelated to the kickback scheme (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

161. On February 23, 2015, Tenet filed an Annual Report in a Form 10-K with the SEC, for the period ending December 31, 2014, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> Clinica de la Mama Investigations and Qui Tam Action —
>
> * * * It is impossible at this time to predict with any certainty the amount and terms of any potential resolution of these matters; however, we believe the amount of the reserve established, as described below, continues to reflect our current estimate of probable liability. We will continue to vigorously defend against the government's allegations.
>
> Our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Management has established reserves of approximately $38 million in the aggregate for our potential obligations with respect to the CFPB investigation, all of the hospitals under review for their billing practices for cardiac defibrillator implantation procedures, and the Clinica de la Mama matters.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

162. The Annual Report filed with the SEC on February 23, 2015 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

163. The statements identified in paragraph 161 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $38 million, which included potential reimbursement obligations for all other hospitals that were unrelated to the kickback scheme and a separate CFPB investigation related to another matter (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to

the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims with the Federal government, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

164. On May 4, 2015, Tenet filed a Quarterly Report in a Form 10-Q filed with the SEC, for the period ending March 31, 2015, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action—*
>
> * * * ***On April 10, 2015, the DOJ informed us that our four hospital subsidiaries that are Defendants in the qui tam action have also been designated as targets of the government's criminal investigation.***
>
> * * *
>
> It is impossible at this time to predict with any certainty the amount and terms of any potential resolution of these matters; however, we believe the amount of the reserve established, as described below, continues to reflect our current estimate of probable liability. We will continue to vigorously defend against the government's allegations.
>
> Our analysis of each of these pending reviews is still ongoing, and we are unable to predict with any certainty the progress or final outcome of any discussions with government agencies at this time. ***Management has established reserves of approximately $34 million in the aggregate for our potential obligations with respect to the Clinica de la Mama matters, all of the hospitals under review for their billing practices for cardiac defibrillator implantation procedures, and the CFPB investigation.*** Changes in the reserves may be required in the future as additional information becomes available. We cannot predict the ultimate resolution of any governmental review, and the final amounts paid in settlement or otherwise, if any, could differ materially from our currently recorded reserves.

165. The Quarterly Report filed with the SEC on May 4, 2015 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

166. The statements identified in paragraph 164 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $34 million, which included potential reimbursement obligations for all other hospitals that were unrelated to the kickback scheme and a separate CFPB investigation related to another matter; and (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicare health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

167. On August 3, 2015, Tenet filed a Quarterly Report on Form 10-Q with the SEC, for the period ending June 30, 2015, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action—*
>
> * * * On April 10, 2015, the DOJ informed us that our four hospital subsidiaries that are Defendants in the qui tam action have also been designated as targets of the government's criminal investigation. ***On May 6, 2015, we received a grand jury subpoena pursuant to which the DOJ informed us that it is seeking additional documents pertaining to the four hospitals, as well as other hospitals in our Southern region. These are hospitals that might have had interactions***

> ***during the period from January 2000 through May 2015 with certain individuals who are targets of the pending criminal investigation.*** We are in the process of producing responsive documents to this subpoena.
>
> * * * Because these criminal investigations and proceedings are at an early stage, it is impossible at this time to predict with any certainty the terms, or potential impact on our business or financial condition, of any potential resolution of these matters. We will continue to vigorously defend against the government's allegations.
>
> ***Management has established a reserve of approximately $20 million to reflect the low end of the range of probable liability in connection with the civil matter discussed above.*** However, changes in the reserve may be required in the future as additional information becomes available, and the ultimate amount required to resolve such matter could materially exceed the reserve.

168. The Quarterly Report filed with the SEC on August 3, 2015 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

169. The statements identified in paragraph 167 were materially false and misleading when made because Tenet (a) materially underestimated the reserve to resolve the Clinica matter by providing a materially false estimate of $20 million and (b) failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

170. On November 11, 2015, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, for the period ended September 30, 2015, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Investigations and Qui Tam Action*—As previously disclosed, we and four of our hospital subsidiaries are Defendants in civil litigation (*United States of America, ex rel. Ralph D. Williams v. Health Management Associates, Inc., et al.*) that alleges that our hospital subsidiaries' contractual arrangements with Hispanic Medical Management, Inc. ("HMM") violated the federal and state anti-kickback statutes and false claims acts. HMM owned and operated clinics that provided, among other things, prenatal care predominantly to uninsured patients. The hospital subsidiaries contracted with HMM for translation, marketing, management and Medicaid eligibility determination services. The civil litigation originated as a qui tam lawsuit. Subsequently, the Georgia Attorney General's Office and the U.S. Attorney's Office intervened in the qui tam action. The four hospitals that are Defendants in the proceeding are: Atlanta Medical Center, North Fulton Hospital, Spalding Regional Hospital and Sylvan Grove Hospital.
>
> * * * We believe that the investigations focus on various time periods for each hospital (ranging from three months to 13 years) during which the respective hospital provided care to HMM patients. We are cooperating in the investigations and have responded, and continue to respond, to document and other requests pursuant to subpoenas issued to us and the four subsidiaries.
>
> Although we intend to vigorously contest any allegations that we or our four hospital subsidiaries violated the law, it is not possible at this time to predict the ultimate outcome of the pending litigation, which has not yet proceeded to trial, nor the ultimate outcome of the government's ongoing civil and criminal investigations.
>
> . . .
>
> For the nine months ended September 30, 2015 and 2014, we recorded costs of $67 million and $19 million, respectively, in continuing operations, primarily related to costs associated with various legal proceedings and governmental reviews. During the nine months ended September 30, 2015, we reduced a previously established reserve for a legal matter in discontinued operations by approximately $3 million based on updated claims information.

171. The Quarterly Report filed with the SEC on November 11, 2015 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

172. The statements identified in paragraph 170 were materially false and misleading when made because Tenet failed to provide a range for the loss contingency of, at least, $72 million (the profits Tenet had earned through the kickback scheme) and $438 million (three times the revenue Tenet earned from the kickback scheme pursuant to the statute) in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

173. On February 22, 2016, Tenet filed an Annual Report in a Form 10-K with the SEC, for the period ended December 31, 2015, in which the Company made the following materially false and misleading statements regarding the amount reserved for the Clinica matter:

> *Clinica de la Mama Qui Tam Action and Criminal Investigation* —As previously disclosed, we and four of our hospital subsidiaries are Defendants in civil qui tam litigation (*United States of America, ex rel. Ralph D. Williams v. Health Management Associates, Inc., et al.*) that alleges that the contractual arrangements between each of Atlanta Medical Center, North Fulton Hospital, Spalding Regional Medical Center and Hilton Head Hospital and Hispanic Medical Management, Inc. ("HMM") violated the federal and state anti -kickback statutes and false claims acts. HMM owned and operated clinics that provided, among other things, prenatal care predominantly to uninsured patients. Beginning in 2000, the hospital subsidiaries contracted with HMM for translation, marketing, management and Medicaid eligibility determination services. Subsequently, the Georgia Attorney General's Office and the U.S. Attorney's Office intervened in the qui tam action.

If the plaintiff in the pending civil litigation were to prevail, the potential sanctions could include up to three times the reimbursement of relevant government program payments received by the four hospital subsidiaries for uninsured HMM patients treated at the hospitals, the assessment of civil penalties and potential exclusion from participation in federal healthcare programs.

Also as previously disclosed, the U.S. Department of Justice ("DOJ") is conducting a criminal investigation of us, certain of our subsidiaries and former employees with respect to the contractual arrangements between HMM and the four hospitals. We are cooperating in the investigation and have responded, and continue to respond, to document and other requests pursuant to subpoenas issued to us and the four subsidiaries. If we or our subsidiaries were determined in any potential criminal proceeding to have violated the federal anti-kickback statute, the sanctions would include fines, which could be significant, and mandatory exclusion from participation in federal healthcare programs. Additional information regarding the procedural history of the qui tam action and criminal investigation is contained in quarterly and annual reports we have previously filed with the SEC.

***In January 2016, we commenced discussions with the DOJ and the State of Georgia regarding potential resolution of these matters. Management increased its aggregate reserve for these matters in the three months ended December 31, 2015 from $20 million to $238 million to reflect an offer we made on February 18, 2016 to resolve the criminal investigation and civil litigation.*** We expect that the DOJ will make a counterproposal, and there can be no assurance that the ongoing discussions to resolve these matters will be successful. The terms of a final resolution may require us to pay significant fines and penalties and give rise to other costs or adverse consequences that materially exceed the reserve we have established. Based on the ongoing uncertainties and potentially wide range of outcomes associated with any potential resolution, we cannot estimate the ultimate amount of potential loss or range of reasonably possible loss we may face.

In addition to the payment of a monetary penalty, the final terms of any resolution of these matters could include: (i) the execution by the Company of a Corporate Integrity Agreement or a non-prosecution agreement, which may provide for the appointment of a corporate monitor and ongoing compliance audits; (ii) a deferred prosecution agreement by an intermediate subsidiary of the Company; and (iii) a commitment that one or more of the hospital subsidiaries subject to the investigation and proceedings enter into a guilty plea. The non-monetary terms of any resolution could expose us to increased operating costs, reputational harm, administrative burdens, and diminished profits and revenues.

To the extent that either the civil or the criminal matter discussed above is determined adversely to our interests, such determination could have a material adverse effect on our business, financial condition, results of operations or cash flows.

174. The Annual Report filed with the SEC on February 22, 2016 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

175. The statements identified in paragraph 173 were materially false and misleading when made because Tenet failed to disclose that the high end of the range of loss was, at least, $438 million in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

176. On May 2, 2016, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, for the period ended March 31, 2016, in which the Company made the following materially false and misleading statements regarding the amount reserved to resolve the Clinica matter:

> *Clinica de la Mama Qui Tam Action and Criminal Investigation*—
>
> In January 2016, we commenced discussions with the DOJ and the State of Georgia regarding potential resolution of the qui tam action and criminal investigation. ***In the three months ended March 31, 2016, we increased the aggregate accrual for these matters from $238 million to $407 million to reflect the most recent offer we made on April 25, 2016 to resolve the criminal investigation and civil litigation. The offer was not accepted, but the parties continue to engage in discussions to resolve these matters.*** There can be no assurance that ongoing discussions will lead to a resolution. The terms of a final resolution of these matters may require us to pay significant fines and penalties and give rise to other costs or adverse consequences that materially exceed the accrual we have established. Based on the ongoing uncertainties and potentially wide range of outcomes associated with any potential resolution, we cannot estimate the amount of potential loss or range of reasonably possible loss in excess of the amount accrued that we may face.

> In addition to the payment of a monetary penalty, the final terms of any resolution of these matters could include: (i) the execution by the Company of a Corporate Integrity Agreement or a non-prosecution agreement, which may provide for the appointment of a corporate monitor and ongoing compliance audits; (ii) a deferred prosecution agreement by an intermediate subsidiary of the Company; and (iii) a commitment that one or more of the hospital subsidiaries subject to the investigation and proceedings enter into a guilty plea. The non-monetary terms of any resolution could expose us to increased operating costs, reputational harm, administrative burdens, and diminished profits and revenues.
>
> If our efforts to negotiate a settlement ultimately are unsuccessful, and we or our subsidiaries are determined to have violated the federal anti-kickback statute, the sanctions could include fines, which could be significant, and mandatory exclusion from participation in federal healthcare programs.
>
> To the extent that either the civil or criminal matter discussed above is determined adversely to our interests, such determination could have a material adverse effect on our business, financial condition, results of operations or cash flows.

177. The Quarterly Report filed with the SEC on May 2, 2016 was signed by Defendants Fetter and Cancelmi, and contained their signed SOX certifications as stated in ¶ 121 above.

178. The statements identified in paragraph 176 were materially false and misleading when made because Tenet failed to disclose that the high end of the range of loss was, at least, $438 million in violation of GAAP ASC 450, knowing that the government had manifested an awareness of potential material claims under the FCA and the Anti-Kickback statute that may result in a material loss. Pursuant to ASC 450, it was more than reasonably possible that Defendants would have to return at least their profits as well as the fact that Tenet had submitted tens of thousands of false claims to the Medicare and Medicaid health programs, each of which brought with it a penalty of $5,000 to $10,000, and as much as treble the revenue they earned from the illegal kickback scheme, especially given the fact that this was Defendants' second serious violation of the federal statutes that regulate the Medicare and Medicaid health programs.

**Series of Partial Disclosures**

179. The Company slowly leaked the negative news about its rampant violations of the Anti-Kickback statute and the FCA, and its decade-long kickback scheme into the market.

180. On February 24, 2014, Tenet partially disclosed the issues related to the kickback scheme and the government investigation, causing the stock to drop 9%. However, in complete violation of GAAP, Defendants, failed to disclose that Defendants knew that it was reasonably possible that the upper end of the range of liability was well over $400 million, especially given this was the Company's second major offense.

181. Then, on August 1, 2016, Tenet filed a Quarterly Report in a Form 10-Q with the SEC, in which the Company disclosed that it had reached an agreement in principle with the DOJ and the State of Georgia to resolve the Clinica matter by paying $513,788,345:

> *Clinica de la Mama Qui Tam Action and Criminal Investigation*—The Company believes that it has reached an agreement in principle with the U.S. Department of Justice ("DOJ"), the U.S. Attorneys' Offices for the Northern and Middle Districts of Georgia, and the Georgia Attorney General's Office to resolve the civil qui tam litigation (*United States of America, ex rel. Ralph D. Williams v. Health Management Associates, Inc., et al.*) pending in the U.S. District Court for the Middle District of Georgia and the parallel criminal investigation of the Company and certain of its subsidiaries being conducted by the DOJ and the .S. Attorney's Office for the Northern District of Georgia (collectively, the "Clinica de la Mama matters"). ***The agreement in principle contemplates, among other things, payment by the Company of $513,788,345, which is comprised of a civil monetary payment of $368,000,000 and a criminal monetary payment of $145,788,345. Based on the agreement in principle, we have increased our reserve relating to the Clinica de la Mama matters from $407 million to $516 million to reflect the monetary payments and certain other costs to be paid by us.***
>
> In addition to the monetary component, the agreement in principle contemplates that: (i) Tenet HealthSystem Medical, Inc. ("THSM"), an indirect, wholly owned subsidiary of the Company, will enter into a Non-Prosecution Agreement with the DOJ; (ii) the DOJ will appoint a corporate monitor for a period of three years to assess the Company's compliance with the federal anti-kickback and Stark laws; and (iii) our two indirect, wholly owned subsidiaries that previously operated Atlanta Medical Center and North Fulton Hospital, and which currently have no operating assets, will agree to plead guilty under 18 U.S.C. § 371 to a single count of conspiracy to violate the federal anti-kickback statute and defraud the United States. The agreement in principle also contemplates that the Company will enter

into a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services. Based on discussions with the government, and assuming definitive agreements are reached as contemplated by the agreement in principle, none of our operating facilities will be subject to exclusion from participation in federal healthcare programs or payment suspension as a result of the Clinica de la Mama matters.

The implementation of the agreement in principle is subject to the negotiation and approval of definitive agreements and the court's acceptance of the plea agreements, which we believe will be completed in the three months ending September 30, 2016. We expect the civil monetary payment and the criminal monetary payment will be due shortly after sentencing, which we believe will take place in the three months ending September 30, 2016. We expect to fund the payments through general corporate sources of liquidity, including cash on the balance sheet and borrowings under our revolving credit facility.
Although we believe we will reach a final resolution of the Clinica de la Mama matters, there can be no assurance that such a resolution will be reached or that the court will accept the pleas. If a resolution is not reached or approved, or if the terms of the final resolution are materially different than the agreement in principle, the eventual loss related to these matters could materially exceed the amount reserved and could have a material adverse effect on our business, financial condition, results of operations or cash flows.

As previously disclosed, the Clinica de la Mama matters relate to contracts that were in effect for various periods from 2000 to 2013 between four hospitals owned by THSM (Atlanta Medical Center, North Fulton Hospital, Spalding Regional Medical Center and Hilton Head Hospital) and Hispanic Medical Management, Inc. Although our Georgia hospitals have been sold, we have retained any potential liabilities arising from the Clinica de la Mama matters.

182. The market finally learned the full scope of Tenet's liability as a result of its pervasive violations of the Anti-Kickback statute and the FCA. On this news, Tenet's share price fell $1.34, or 4.64%, to close at $27.57 per share on August 2, 2016.

**Post-Class Period Events**

183. On September 30, 2016, AMC and North Fulton agreed to plead guilty, in the Northern District of Georgia, to a conspiracy to defraud the United States and pay and receive healthcare kickbacks and bribes. On the same day, Tenet HealthSystem entered into an NPA with the Fraud Section of the DOJ, pursuant to which Tenet HealthSystem and Tenet agreed to pay $368,000,000 million to the United States, the State of Georgia and the State of South

Carolina to resolve their liability arising under the FCA and the Georgia Medicaid False Claims Act. The NPA stated that AMC and North Fulton agreed to pay $144,715,745 million to resolve the hospitals' criminal liability for knowingly violating the federal Anti-Kickback statute.

184. On October 3, 2016, Defendants issued a press release and filed a Current Report on Form 8-K, in which they disclosed that Tenet HealthSystem entered into an NPA with the Fraud Section of the DOJ, and that Tenet and Tenet HealthSystem, including its subsidiaries, AMC and North Fulton, agreed to pay over $513 million to resolve their liability associated with the Clinica matter.

185. On January 25, 2017, Holland was indicted in the Southern District of Florida on one count of mail fraud, one count of healthcare fraud, and two counts of major fraud against the United States. According to Holland's attorney, the illegal contracts (involved in the kickback scheme) "were openly reviewed and approved at multiple levels of the company[.]" *See* footnote 5, *supra*.

## CLASS ACTION ALLEGATIONS

186. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired Tenet common stock between February 28, 2012 and August 1, 2016, both dates inclusive, seeking to pursue remedies under §§10(b) and 20(a) of the Exchange Act. Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

187. Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tenet common stock was actively traded on the NASDAQ Global Select Market. Because the overwhelming majority of owners hold shares in street name, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Potential Class members may be identified from records maintained by Tenet, their transfer agents, and brokers and banks that hold shares beneficially for investors in street name, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

188. Lead Plaintiffs' claims are typical of the claims of those of the Class, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

189. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

190. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether the Individual Defendants are control persons of Tenet for purposes of the Exchange Act;

b. whether Tenet and the Individual Defendants made materially false and misleading statements, and failed to disclose material information regarding the decade-long kickback scheme at Tenet hospitals and Tenet's deficient compliance program and inadequate policies regarding the Company's internal controls for referral services;

c. whether Tenet and the Individual Defendants made materially false and misleading statements in violation of GAAP by failing to disclose the potential range of loss associated with Defendants' pervasive kickback scheme;

d. whether the Defendants made misrepresentations or omissions with scienter;

e. whether the federal securities laws were violated by Defendants' acts as alleged herein;

f. whether the price of Tenet's securities during the Class Period were artificially

inflated because of the Defendants' conduct complained of herein; and

g. whether the Class has sustained damages as a result of the disclosures alleged herein with respect to their Exchange Act claims and, if so, what is the proper measure of damages.

191. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

192. With respect to the Exchange Act claims, Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Tenet's securities are traded in efficient markets;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ, and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiffs and the Class members purchased and/or otherwise acquired Tenet common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

193. Based upon the foregoing, Lead Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market.

194. Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of § 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

195. Lead Plaintiffs repeat and reallege the allegations contained in paragraphs 1 to 194 above as if fully set forth herein.

196. This Count is asserted against Tenet and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

197. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tenet securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Tenet securities and options at artificially inflated prices.

198. Specifically, Tenet and the Individual Defendants made material misrepresentations and omissions as particularized in paragraphs 120 to 178.

199. By virtue of their positions at Tent, Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and

intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Tenet and Defendants. In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As the senior managers of Tenet, these Individual Defendants had knowledge of the details of Tenet's internal affairs, including the deficiencies in the Company's compliance program and internal controls. In addition, all the Defendants had knowledge of the adequacy of the amount required to be reserved to resolve the Clinica matter.

200. As officers and/or directors of a publicly-held company, and by virtue of their stock sales during the Class Period, the Individual Defendants had a duty to disseminate timely, accurate, full and truthful information regarding Tenet's business, operations, and financial controls. As a result of the dissemination of the aforementioned false and misleading reports and filings, the market price of Tenet securities was artificially inflated throughout the Class Period.

201. In ignorance of the adverse facts concerning Tenet's operations which were concealed by the misrepresentations and omissions alleged herein, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Tenet securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the disclosure of Defendants' wrongdoing described herein.

202. During the Class Period, Tenet securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, directly relying on the materially false and misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired shares of Tenet securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known

the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Tenet securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of Tenet securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

203. By reason of the conduct alleged herein, Tenet and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

204. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period upon the disclosures alleged herein. Tenet and the Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**Violation of § 20(a) of the Exchange Act**

**(against all Individual Defendants)**

205. Lead Plaintiffs repeat and reallege allegations contained in Paragraphs 1 to 204 above, as if fully set forth herein.

206. During the Class Period, the Individual Defendants participated in the operation and management of Tenet, and conducted and participated, directly and indirectly, in the conduct of Tenet's business affairs. Because of their senior positions, they knew the adverse non-public information about Tenet's operations, including Tenet's compliance and ethics program and internal control policies regarding referral sources and the accounting of loss contingencies.

207. As officers of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Tenet's reports and filings and to correct promptly any public statements issued by Tenet which had become materially false or misleading.

208. Because of their positions of control and authority as senior officers, these Defendants were able to, and did, control the contents of the reports and public filings that Tenet disseminated in the marketplace during the Class Period concerning Tenet's compliance program, internal control policies regarding referral sources and the accounting of loss contingencies. Throughout the Class Period, these Defendants exercised their power and authority to cause Tenet to engage in the wrongful acts complained of herein.

209. As control persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Tenet as set forth in Count I.

## REQUEST FOR RELIEF

Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class Representatives;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: April 11, 2017

Respectfully submitted,

_s/ DEAN GRESHAM_
R. Dean Gresham
Texas Bar No. 24027215
dean@stecklerlaw.com
**STECKLER GRESHAM COCHRAN**
12720 Hillcrest Road, Suite 1045
Dallas, TX 75219
Telephone: (972) 387-4040
Fax: (972) 387-4041

*Liaison Counsel for Plaintiffs and Class*

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
lrosen@rosenlegal.com
Phillip Kim
pkim@rosenlegal.com
Alessandra Phillips
aphillips@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, NY 10116
Telephone: (212) 686-1061
Fax: (212) 202-3827

**POMERANTZ LLP**
Patrick V. Dahlstrom
Leigh Handelman Smollar
Omar Jafri
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
email: pdahlstrom@pomlaw.com
lsmollar@pomlaw.com
ojafri@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
jalieberman@pomlaw.com

600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Fax: (212) 661-8665

*Lead Counsel for Plaintiffs and Class*